**BONANZA INTERNATIONAL, INC.**

v.

**RESTAURANT MANAGEMENT CONSULTANTS, INC., et al.**

Civ. A. No. 83–0241.

United States District Court, E.D. Louisiana.

Jan. 8, 1986.

Frederick J. Plaeger, II, Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, La., for plaintiff.

Matt Greenbaum, New Orleans, La., for defendants.

## OPINION

LIVAUDAIS, District Judge.

Plaintiff, Bonanza International, Inc. ("Bonanza"), a corporation incorporated under the laws of the State of Nevada and having its principal place of business in Texas, filed the above captioned civil action against defendants, Restaurant Management Consultants, Inc. ("RMC"), a Louisiana corporation with its principal place of business in Louisiana, Michael Kiene and Paul Kiene, both domiciliaries of Louisiana, seeking the recovery of unpaid royalties from sales by Bonanza Family Restaurants in the southern Louisiana area. Defendants, counterclaimed for damages based on Bonanza's alleged unjust termination of RMC's Area Distributor's Agreement and alleged unjust enrichment. Diversity jurisdiction is proper in this action under 28 U.S.C. § 1332, as the amount in controversy in both the main demand and the counterclaim exceeds the sum of $10,000.00, exclusive of interest and costs and is between citizens of different states.

On July 31, 1981, Michael Kiene purchased all property constituting the Bonanza Family Restaurant business formerly owned and operated by Dixie Stewart d/b/a Stewart Investments, Inc.[1] This sale included the transfer to Mr. Kiene of real estate, lease-hold interests and restaurant fixtures, as well as Stewart's interests and obligations under Bonanza's Area Distributor's Agreement for Southern Louisiana and various Bonanza franchise license agreements. (Plaintiff's Exhibits 1, 2 and 34).

---

1. The name of Dilly Corp., a party to the Area Distributor's Agreement, was changed to Stewart Investments, Inc. on the Area Distributor's Agreement by agreement of February 28, 1966.

Bonanza [2] consented to the assignment of the area distributor and franchise license contracts on the conditions that: a) Paul Kiene would guarantee in favor of Bonanza, all obligations under the Bonanza franchise license agreements and Area Distributor's Agreement (see Plaintiff's Exhibit 3) and; b) Michael Kiene would agree as Area Distributor, to pay all franchise royalties from his and other restaurants in the southern Louisiana area on a weekly basis and would agree to pay, at the closing of the Stewart sale, all monies owed to Bonanza by Stewart. (Plaintiff's Exhibit 15C). Bonanza also required Michael Kiene to participate in a five week training program prior to the closing. (Plaintiff's Exhibit 15A). Mr. Kiene declined the training, advising Bonanza that he had employed Bob McGee who had previously worked as an employee of Stewart and as regional training manager for Bonanza. (Plaintiff's Exhibit 15B).

In accordance with these provisions, Bonanza granted its consent to the assignment of the Franchise, License and Area Distributor's Agreements. [3]

The Area Distributor's Agreement, and the Bonanza Area Distributor General Operating Policies incorporated therein by reference, required Michael Kiene, as Area Distributor, to collect 4.8 percent [4] of gross sales from all Bonanza Family Restaurants in the southern Louisiana area and to remit, as royalties, one-half of this amount to Bonanza. Under the agreement, Bonanza's share of royalties was to be paid in full by check each week by Mr. Kiene. (Plaintiff's Exhibit 1 [Bonanza Sirloin Pit Area Distributor's Agreement for Southern Louisiana, Paragraph 5B and General Operating Poli-

cies for Bonanza Sirloin Pit Area Distributor's Page 3, Paragraph 2] ).

In addition to his obligation to collect royalties from licensees and to remit one-half of these royalties on a weekly basis to Bonanza, Michael Keine, as Area Distributor, was also required to enforce operating standards of cleanliness and uniform quality for all Bonanza licensees in the area in accordance with the licensing agreement and operating policies between Bonanza and each licensee.

Section 14 of the Area Distributor's Agreement, states that the Agreement, "shall terminate automatically ... if the AREA DISTRIBUTOR shall fail to meet any obligations provided for in this agreement, or in the general operating policies applicable to all AREA DISTRIBUTORS, where such defaults shall continue for thirty days or more following the sending of written notice by IFC (Bonanza) to the AREA DISTRIBUTOR, or if he shall fail to take effective legal action against any defaulting BONANZA licensee within his area within a period of thirty days from discovery or notification of any default, infraction or violations of the licensing agreement or General Operating Policies." (Plaintiff's Exhibit 1).

In addition to his obligations as Area Distributor, Michael Kiene was also responsible, as franchise licensee, for the operation of five Bonanza Family Restaurants in the New Orleans area. (B-144, 4517 Veterans Hwy.; B-146, 131 St. Charles Avenue; B-150, 701 Veterans Hwy.; B-154, 9300 I-10 Service Road; and B-156, 4338 St. Charles Avenue). The license agreements for Bonanza Family Restaurants Nos. 144,

---

**2.** International Franchise Corporation, (IFC), a named party in the Area Distributor's Agreement, merged with Diversa, Inc. on December 29, 1965. Diversa, Inc. assigned its interest in the Area Distributor's Agreement to plaintiff, Bonanza International, Inc. on April 25, 1966.

**3.** Michael Kiene subsequently formed and became president of Restaurant Management Consultants, Inc. ("RMC"), a Louisiana business corporation, and on November 15, 1981 assigned to the corporation his rights and interest in and to the Area Distributor's Agreement. As part of

this assignment, Michael Kiene personally guaranteed that RMC would carry out all the terms and conditions of the Area Distributor's Agreement. (Plaintiff's Exhibit 4).

**4.** The 2.8 percent royalties provided for in the original Bonanza General Operating Policy were increased to 4.8 percent by written agreement with Stewart on April 18, 1967 following Bonanza's discontinuance of meat commission payments to Area Distributor's. (See April 18, 1967 Agreement attached to Plaintiff's Exhibit 1).

146 and 150 provided for the situation where the Area Distributor was also a franchise licensee within his own area. Instead of requiring the licensee to remit a 4.8 percent royalty to the Area Distributor and the Area Distributor to remit one-half of that royalty to Bonanza, these license agreements simply provided for the licensee/area distributor to pay directly to Bonanza a royalty equaling 2.4 percent of each of his restaurant's gross weekly receipts. The licensee/area distributor was required under the agreements to complete a royalty report at the close of business each Sunday and to mail the report, together with the royalty check, to Bonanza each week. (Plaintiff's Exhibits 2B, 2C and 2E [Paragraphs VI G]).

The remaining two license agreements for B–154 and B–156 were standard license agreements which required the licensee to remit 4.8 percent royalty payment each week, together with a royalty remittance report, to the Area Distributor. It was also required that a copy of the royalty remittance report be sent to Bonanza. The Area Distributor, under its agreement with Bonanza, would in turn remit the 2.4 percent royalty to Bonanza (Plaintiff's Exhibits 2H and 2I [Paragraph VI G]).

In addition to being obligated to pay weekly royalties, Mr. Kiene, as licensee, was required under the licensing agreements to operate his restaurants in compliance with all applicable laws, including state health codes, and in compliance with the operational requirements of Bonanza, as described in the Bonanza operations and procedures manual, particularly with respect to restaurant cleanliness and food quality. (Plaintiff's Exhibits 2B, 2C, 2E, 2H and 2I [Paragraph IV, VI B, VI(I) and VII]).

The Bonanza Operations and Procedures Manual detailed Mr. Kiene's obligations to remit weekly royalties and maintain sanitary conditions, and it set out procedures for fulfilling these obligations. (Plaintiff's Exhibit 33).

Each of Mr. Kiene's five license agreements with Bonanza provided that Bonanza had the right to terminate the agreements, upon notice in writing to the licensee, in the event the licensee defaulted in the performance of the duties or obligations provided for therein, "including, but not limited to, the failure to make payment of royalties as herein provided, where such defaults shall continue for ten days or more following the sending of written notice...." The agreements further provided for termination in the event the licensee "... shall fail to adhere to the Bonanza Operation and Procedures Manual...."

Plaintiff alleges that despite Bonanza's efforts to support Mr. Keine and Restaurant Managment Consultants, Inc., they failed to comply with the terms and conditions of the applicable Area Distributor's Agreement and franchise license agreements.

Evidence adduced at the trial of this matter supports Bonanza's position that RMC, et al failed to honor the terms of the Area Distributor's and Franchise license agreements.

Beginning with cleanliness, the General Operating Policies for the Area Distributorship (Plaintiff's Exhibit 1) provides:

### Enforcement of Standards

Because your franchise is an extremely valuable asset and in order to protect both your investment as well as the investments of all other AREA DISTRIBUTORS and Licensees, IFC reserves the right to police each and every BONANZA Sirloin Pit, directly or through the AREA DISTRIBUTOR, and specifically with regard to cleanliness of kitchen, dining area, exterior and food quality. An improperly or poorly maintained BONANZA or one serving inferior foods or functioning with substandard furnishings, equipment, signs or decor will injure or even seriously damage the reputation of any other BONANZAS, and we must protect this vital element of the profit picture of our DISTRIBUTORS and licensees; to this extent repeated or deliberate disregard of our standards may lead to franchise termination.

If the AREA DISTRIBUTOR is aware of or is called upon to correct any violations of chain policy (as enunciated in this and in the BONANZA General Operating Policies) with specific regard to Standards as outlined above, he will take immediate action to enforce the correction of such violation, including, if necessary, the prompt institution of legal proceedings against any improperly functioning BONANZA licensee. All such legal proceedings shall be coordinated with IFC's General Counsel. Similarly, DISTRIBUTOR shall, if necessary or if called upon, take prompt action to terminate the franchise of any delinquent or defaulting licensee and shall enforce all of the termination and post-termination clauses provided in the BONANZA License Agreements.

In addition, the individual Area Distributor Bonanza Sirloin Pit License Agreements, (See Plaintiff's Exhibit 2e for example), state:

"The operation of the AREA DISTRIBUTOR'S BONANZA Sirloin Pit shall be in strict conformity with the terms of this agreement and with the BONANZA Operating and Procedures Manual, which is specifically incorporated herein by reference and made a part of this agreement. In order to protect the good will and reputation of the BONANZA Sirloin Pit chain, BONANZA INTERNATIONAL reserves the right to inspect the subject BONANZA Sirloin Pit, particularly with regard to cleanliness of kitchen, dining area, exterior, menu, and food quality, and to insist that uniformity in these areas be maintained. The failure to maintain the required standards in the subject BONANZA Sirloin Pit to the satisfaction of BONANZA INTERNATIONAL shall be grounds for termination of this license as herein provided in paragraph XIV."

Paragraph XIV provides:

BONANZA INTERNATIONAL shall have the right to terminate this License Agreement upon notice in writing to AREA DISTRIBUTOR upon the occurrence of any of the following events:

In the event AREA DISTRIBUTOR shall fail to adhere to the BONANZA Operating and Procedures Manual, including all supplements, amendments and revisions thereto issued by BONANZA INTERNATIONAL.

Under the topic of "Sanitation" in the Bonanza Operations and Procedure Manual several factors are listed as important in outbreaks of food-borne illness. For example: "Improper food storage ... Uncovered foods on refrigerator shelves; raw foods stored directly on shelves or against refrigerator walls; raw foods in direct contact with prepared foods ... Insects and rodents ... Failure to eliminate breeding or entry areas; failure to eliminate grime, spilled food and trash which became food, breeding and nesting attractions for pests; failure to report and take control action when pests or evidence of pests are noted." In addition to this list, the manual sets forth procedures to be followed: For example: "Cover all food items; keep the kitchen clean of debris and sanitized; store food off the floor in sealed containers; control pests; keep corners and floors free of debris and wetness; etc." The manual specifically addresses methods of proper maintenance such as "cleaning stainless steel." Lastly, it recommends a detailed weekly checklist on Housekeeping and Maintenance procedures which should be followed.

In accordance with rights reserved in the License Agreements, Bonanza International conducted periodic inspections of the Bonanza Restaurants. In early 1982, Bonanza conducted an inspection of Mr. Kiene's restaurants and found them to be generally unclean and poorly managed.

Ralph Messer, a Bonanza Field Service Representative, prepared a Quality Assurance Evaluation which specified the various operational deficiencies. Mr. Messer discussed this evaluation with Mr. Kiene and his assistant, Harvey Hays. (Plaintiff's Exhibits 10A and 10B). Mr. Messer was particularly concerned that B–144 had re-

ceived a "commendable" rating when operated by Stewart and that, after six months of operation by Mr. Kiene, the restaurant dropped two rating levels to "marginal." Mr. Messer advised Mr. Kiene that his restaurants would have received "commendable" ratings had he simply corrected the "soap and water" problems through routine cleaning. Following these evaluations, Mr. Kiene was warned in writing by Bonanza Vice-President, Robert Hacker, that his failure to immediately correct the various operational deficiencies could result in the termination of his franchise agreements. (Plaintiff's Exhibit 15P).

Shortly after Bonanza's unfavorable evaluation of Mr. Kiene's restaurants, the Orleans Parish Department of Health and Human Resources cited Mr. Kiene for twelve violations of the Louisiana Health Code at Bonanza Family Restaurant No. 146. (Plaintiff's Exhibit 12A).

The sanitary and operational conditions of Mr. Kiene's restaurants continued to decline. On May 19, 1982 and again on June 10, 1982, the Louisiana Health and Human Resources Department cited Mr. Kiene for more than ten violations of the State Health Code at Bonanza Family Restaurant No. 146, including three violations deemed "critical." (Plaintiff's Exhibits 12B and 12C). Enforcement proceedings were instituted by the Health Department and subsequently compromised based on Mr. Kiene's assurances that he would correct all violations within one month. (Plaintiff's Exhibits 12D and 12E). Mr. Kiene made some temporary improvements to the sanitary conditions of his restaurants, but soon thereafter allowed these conditions to again decline.

On October 10, 1982, the state health officials again cited Mr. Kiene for health code violations (Plaintiff's Exhibit 12H), and on October 28, 1982, Bonanza Field Service Representative, David Ledford, conducted an inspection of Mr. Kiene's restaurants, at which time Bonanza Family Restaurants Nos. 144 and 146 received the lowest possible rating of "provisional" (i.e. "far below all acceptable standards, imme-

diate action required for improvement"). Mr. Ledford particularly noticed evidence of rodents and roaches and found the restaurants to be unclean. A Quality Assurance Evaluation detailing the many deficiencies was prepared for each restaurant and discussed with the restaurant managers. An "Action Plan" was developed to rectify the problems within a specified time frame, not to exceed thirty days. As with the previous evaluation performed by Mr. Messer, it was noted by Mr. Ledford that many of the problems could be rectified with "soap and water". (Plaintiff's Exhibits 10B and 10E).

As stated previously, one of the specified occurrences upon which Bonanza International could terminate a License Agreement upon notice in writing to the Area Distributor was the failure of the Area Distributor to adhere to the Bonanza Operating and Procedures Manual. Another occurrence upon which Bonanza International could terminate a License Agreement provides:

> "In the event Area Distributor shall default in the performance of the duties or obligations provided for in this agreement, specifically including, but not limited to, the failure to make payment of royalties as herein provided, where such default shall continue for ten (10) days or more following the sending of written notice by Bonanza International to Area Distributor." (Bonanza International has the right to terminate the License Agreement).

(Plaintiff's Exhibit 2e).

In addition to improperly maintaining his restaurants, Mr. Kiene had become increasingly delinquent in remitting royalty payments to Bonanza. Royalty payments for November and December, 1981 sales were not remitted until March, 1982. This included royalties due from both Mr. Kiene's restaurants and from other restaurants in the southern Louisiana area.

Testimony at trial supported Bonanza's contention that they repeatedly attempted to contact Mr. Kiene to discuss the delinquent royalty payments but their calls went unanswered. Virginia Waldvogel, an

employee of Mr. Kiene, testified that during the Spring of 1982, Mr. Kiene avoided calls from creditors and instructed her to advise Bonanza and the other creditors that he was unavailable.

Bonanza's Regional Marketing Manager, John Bill, after numerous unsuccessful attempts to telephone Mr. Kiene, wrote to him on May 27, 1982 about his lack of communication with Bonanza and the excessive delinquency in the payment of his National Creative Group advertising dues. (Plaintiff's Exhibit 15AA).

On June 2, 1982, Bonanza sent notice to Mr. Kiene that he was in default under his Area Distributor's Agreement due to the nonpayment of royalties from sales by his and other restaurants in his area for the months of March, April and May. He was notified that the failure to cure the default within ten days could result in the termination of his Area Distributor's Agreement with Bonanza. (Plaintiff's Exhibit 16). Within three days of receiving this letter, Mr. Kiene mailed a check to Bonanza for royalties through the month of April (Plaintiff's Exhibits 17A and 17B).

Mr. Kiene continued to be delinquent in the payment of all royalties. On October 20, 1982 he remitted to Bonanza royalties based on sales for the week ending July 11, 1982. This was the last royalty payment ever received by Bonanza for any of Mr. Kiene's five restaurants[5] (Plaintiff's Exhibits 25 and 32). Mr. Kiene acknowledged at trial that he remitted no royalty payments to Bonanza from licensee restaurants owned and operated by him, after July 11, 1982.

Gregg Simmons, Bonanza's Director of Credit and Collections, testified at trial that he made numerous attempts during October to telephone Mr. Kiene to discuss his non-payment of royalties. After Mr. Kiene failed to return his calls, Simmons reported Mr. Kiene's lack of cooperation to Bonanza management.

Bonanza representatives testified that after considering Mr. Kiene's four month delinquency in the payment of royalties from his restaurants, his prior default for nonpayment of royalties, his total lack of cooperation or communication with Bonanza, his continued failure to maintain two of his restaurants in accordance with Bonanza standards and state health laws, and his failure to promptly remit to Bonanza royalties which he had collected from other restaurants in his area, Bonanza management determined that Mr. Kiene should be placed in default under his Area Distributor's Agreement and license agreements with Bonanza.

On November 5, 1982, Bonanza sent written notice of default under the Area Distributor's Agreement to Mr. Kiene as President of Restaurant Management Consultants, Inc. and separate written notices of default under each license agreement to Mr. Kiene as licensee. These notices were all sent to the proper addresses by certified mail, return receipt requested, and all detailed the reasons for the defaults under the agreements. (Plaintiff's Exhibits 7A–7F). The notices sent to RMC (Plaintiff's Exhibit 7A), and the notices sent to Mr. Kiene at B–144 and B–156 (Plaintiff's Exhibits 7E and 7F), were returned to Bonanza marked "refused". Defendant, Michael Kiene, personally received the remaining three default notices.

All three letters received by Mr. Kiene demanded repayment of royalties from sales after July 11, 1982, and the notices for B–144 and B–146 further demanded that he cure the operational defaults described in the October Quality Assurance Evaluations performed by Mr. Ledford. (Plaintiff's Exhibits 7B, 7C and 7D). All notices warned Mr. Kiene that his agreements with Bonanza would be terminated if his contractual defaults were not cured

---

**5.** In November and December, 1982, following Mr. Kiene's receipt of default letters from Bonanza, Mr. Kiene remitted Bonanza's portion of some of the royalties collected from restaurants *other than his restaurants.* None of these pay-

ments included any royalties from Mr. Kiene's five restaurants and, to this date, Bonanza has not received royalties from Mr. Kiene's restaurants for sales made after July 11, 1982. (Plaintiff's Exhibit 25).

within the contractually specified period of time.

Subsequently, Mr. Kiene telephoned Mr. Simmons and said that he would send Bonanza approximately $23,000.00, Bonanza's portion of royalties collected by Mr. Kiene from other licensees in the southern Louisiana area. Mr. Simmons informed Mr. Kiene that in addition to the $23,000.00 in royalties from sales by other licensees, he would also have to remit approximately $13,000.00 in royalties from sales by his restaurants within a week (Plaintiff's Exhibit 17C).

On November 22nd, Bonanza received from Mr. Kiene some of the royalties owing from other licensees in Mr. Kiene's area but they did not receive any royalty payments owed by any of Mr. Kiene's five restaurants.

Becoming concerned with Mr. Kiene's lack of cooperation, Mr. Ledford reinspected Bonanza Restaurants Nos. 144 and 146 on November 28, 1982. Mr. Ledford found that the operational and sanitary deficiencies noted during his previous inspection had not only not been corrected but had actually worsened. (Plaintiff's Exhibits 10C and 10F). Mr. Ledford took photographs of the restaurants and delivered these photographs, together with copies of the Quality Assurance Evaluations, to Bonanza management. (Plaintiff's Exhibits 11A and 11B).

On December 9, 1982, following defendants' continued failure to remit royalties to Bonanza from the operations of Mr. Kiene's five restaurants for over a five-month period and the continued failure to correct the sanitary and operational violations in B-144 and B-146 within thirty days of the notice of default, Bonanza sent notice to Mr. Kiene that the Area Distributor's Agreement and the five franchise license agreements had been terminated in accordance with the terms of such agreements. Michael Kiene received notice of the terminations on or about December 13, 1982. (Plaintiff's Exhibits 8A–8F). These letters further advised Mr. Kiene to discontinue holding his restaurants out to the public as being Bonanza restaurants and to remove all signs, trademarks and advertising which would associate his restaurants with Bonanza.

Bonanza also alleges that dispite this notice, Mr. Kiene continued to operate his restaurants as Bonanza restaurants and therefore in addition to past royalties owed, Mr. Kiene also is indebted to Bonanza for any benefit he received from the use of the Bonanza trademarks and name following the termination of his license agreements. Evidence produced at trial did not support Bonanza's claim that Mr. Kiene did indeed benefit from the use of the Bonanza trademark and name after the termination of said agreements. Considering this factor and the fact that Bonanza had previously terminated the Area Distributor's and the five franchise license agreements, Bonanza's claim for amounts due from December 9, 1982–1983, lacks merit.

Mr. Kiene eventually discontinued operating his restaurants during 1983 (Plaintiff's Exhibit 6). The former B-146 was sold to his attorney, Bill Ryan, for a stated price of $250,000.00. According to Mr. Kiene, the remaining restaurants were sublet or assigned for an initial sum in excess of $350,000.00. He continues to receive monthly rents from three of the restaurants and receives a percentage of monthly sales from those restaurants leased to Alvin Copeland (which are operated as Copeland's Restaurants).

Mr. Kiene and RMC did not remit to Bonanza royalties which they received from other licensees in the southern Louisiana area both prior and subsequent to the termination of the Area Distributor's Agreement. These royalties were mostly for sales made before the effective date of termination. (Plaintiff's Exhibit 9). Defendants admitted at trial that the last payment for royalties for the other restaurants was made in late November of 1982.

It is axiomatic in all jurisdictions that written agreements have the effect of law on the parties who have legally formed them and that the courts are required to adjudicate the parties' rights in accordance

with the terms of such written agreements. La.C.C. Art. 1983, as amended (formerly La.C.C. Art. 1901). *National Bench Advertising, Inc. v. Parish of Jefferson*, 458 So.2d 179 (La.App. 5th Cir.1984); *Laba v. Carey*, 29 N.Y.2d 302, 308, 277 N.E.2d 641, 644, 327 N.Y.S.2d 613, 618 (1971). The "law between the parties" in the present case is clearly set forth in the Area Distributor's Agreement and Franchise License Agreements. (Plaintiff's Exhibits 1 and 2).

Paragraph 2 of the General Operating Policies for Bonanza Sirloin Pit Area Distributors, which was incorporated by reference into the Bonanza Sirloin Pit Area Distributor's Agreement for Southern Louisiana, provided for Bonanza and Mr. Kiene to equally share all royalties for gross sales by the Bonanza restaurants in his territory and for Mr. Kiene to pay to Bonanza its portion of the royalties "in full by check to Bonanza each week." Mr. Kiene testified at trial that he breached this term of the agreement and that no royalty payments whatsoever were remitted to Bonanza from sales by his five restaurants after July 11, 1982. RMC's bookkeeper, Julianne Carmen, also testified that she was responsible for keeping records of royalty payments by RMC to Bonanza and that, based on such records, the last royalty payment ever remitted to Bonanza by RMC for Mr. Kiene's five restaurants was for the week ending July 11, 1982. Both the business records of Bonanza and the testimony of its Director of Credit and Collections, Gregg Simmons, verify defendants' breach of their obligation to make royalty payments to Bonanza. (Plaintiff's Exhibits 25 and 32).

In addition to the language cited earlier contained in the Area Distributor Bonanza Sirloin Pit License Agreement (Plaintiff's Exhibit 2E), with regard to "Bonanza International's Right to Terminate", section 14B of the Area Distributor's Agreement states that the agreement "shall terminate automatically in the event" that the Area Distributor "shall fail to meet any obligation provided for in this agreement, or in the General Operating Policies applicable to all Area Distributors, where such default shall continue for thirty days or more following the sending of written notice" by Bonanza to the Area Distributor. (Plaintiff's Exhibit 1). Based on the uncontradicted evidence, Mr. Kiene and RMC failed to meet their obligation to make royalty payments each week to Bonanza. Bonanza's associate counsel, Kevan Dilbeck, sent written notice to Mr. Kiene and RMC on November 5, 1982 that they were in default under the Area Distributor's Agreement due to the non-payment of royalties. At that time, defendants were approximately four months delinquent in royalty payments for Mr. Kiene's five restaurants. None of these royalties were remitted to Bonanza within thirty days following the sending of such notice and, have never been remitted to Bonanza. Such non-payment resulted in the automatic termination of the Area Distributor's Agreement. Notice of this termination was sent to Mr. Kiene on December 9, 1982 with an effective date of December 15, 1982. (Plaintiff's Exhibit 8).

■ The courts have repeatedly stated that termination clauses agreed upon by the parties shall be enforced as written. *Inabnet v. Pan American Life Insurance Company*, 267 So.2d 774 (La.App. 2nd Cir. 1972); *Noah v. L. Daitch & Company*, 22 Misc.2d 649, 192 N.Y.S.2d 380 (S.Ct.N.Y. 1959). *See Niagara Mohawk Power Corporation v. Graver Tank and Manufacturing Company*, 470 F.Supp. 1308 (N.D. N.Y.1979); *Newfield v. General Motors Corporation*, 84 A.D.2d 548, 443 N.Y.S.2d 239 (1981). Mr. Kiene's admitted non-payment of royalties and Bonanza's compliance with the notice provision of the contract alone justify the automatic termination of the Area Distributor's Agreement.

■ Defendants submitted at trial that Bonanza had verbally agreed to consider royalty payments remitted within eight weeks as timely. While Bonanza admitted that it would not take steps to exercise its termination rights under the agreements if it received royalty payments from an Area Distributor within eight weeks of the sales

week, there was no evidence that Bonanza agreed to any oral modification of the contract. Paragraph 15 of the contract specifically provides that any modifications must be in writing and executed by a Bonanza officer. Defendants do not contend that any such written modification exists in the present case and, in fact, Bonanza never modified, orally or in writing, the requirement of weekly royalty payments by the Area Distributor.

Even if the contract had been properly modified to permit royalty payments to Bonanza within eight weeks of a franchisee's sales week, the evidence presented in this case proved that Mr. Kiene was substantially more than eight weeks delinquent in royalty payments at the time of the November 6, 1982 default.

Gregg Simmons testified at trial that the usual procedure he followed when royalty payments were not timely remitted was to: (1) allow a short grace period; (2) phone the Area Distributor to see where the payments were; (3) attempt to work out a 5—60 day payment plan (depending on the amount of the debt outstanding) and ultimately if none of the proceeding produced acceptable results; (4) contact the legal department about sending out a notice of default. Mr. Simmons further testified that in June of 1982 when Mr. Kiene failed to remit his royalty payments timely, Simmons contacted Mr. Kiene, they resolved a dispute over what amount was owed and payment was accepted. However, when Mr. Kiene failed to timely remit his payments again, Mr. Simmons resorted to having the legal department send out a default because Mr. Kiene never returned his calls or attempted to work out an acceptable payment plan.

In addition to their breach of the royalty payment provisions of the Area Distributor's Agreement, Mr. Kiene and RMC committed other breaches which independently provided grounds for termination of the contract. Paragraph 14B provides for termination if the Area Distributor fails to take effective legal action against any defaulting Bonanza licensee within his area

within "thirty days from discovery or notification of any default, infraction or violation of licensing agreement or general operating policies." Mr. Kiene admittedly received the November 5, 1982 default notices for B–144, B–146 and B–150 advising him of defaults in royalty payments for all three restaurants and of operations defaults, as specified in a copy of Mr. Ledford's October 28, 1982 Quality Assurance Evaluation for B–144 and B–146, which was enclosed with the default notice. (Plaintiff's Exhibits 7B, 7C and 7D). He took no action to cure these licensee defaults.

Mr. Kiene wrote to Bonanza on December 28, 1982 (six weeks after the default and two weeks after the termination of the Area Distributor's and Franchise License Agreements) and advised Bonanza that he had received no payments from his own stores since July 11, 1982 and requested that Bonanza contact him to discuss instituting lawsuits against the licensees. The deceptiveness of this letter and the falsity of the statements contained therein were highlighted by the evidence at trial which showed that in fact, Mr. Kiene was receiving *daily* receipts of all revenues from his five restaurants after July 11, 1982. (Plaintiff's Exhibit 18b). As Area Distributor, Mr. Kiene was obligated under the Area Distributor's Agreement to take action to collect royalties from all licensees, including himself, within thirty days of notification of non-payment. This procedure was obviously not followed in the present case.

In addition, Mr. Kiene and RMC took no action to enforce Bonanza's operating policies and standards for cleanliness with regard to B–144 and B–146. The enforcement of such policies and standards were required under the Area Distributor's Agreement. (Plaintiff's Exhibit 1, Paragraph 5C of the Area Distributor's Agreement and Page 1 (Paragraphs 5 and 6), Page 4–5 (Paragraph 6) of the General Operating Policies for Bonanza Sirloin Area Pit Distributors; and Plaintiff's Exhibit 33). Mr. Kiene acknowledged at trial

that it was the duty of an area distributor to see that the stores were properly maintained in accordance with Bonanza's policies.

Also, the General Operating Policies, (Plaintiff's Exhibit 1) at paragraph 6, cited earlier, reserves Bonanza's right to monitor every Bonanza restaurant, "... specifically with regard to cleanliness of kitchen, dining area, exterior and food quality." The policy further provided "if the Area Distributor is aware of or is called upon to correct any violations of chain policy (as enunciated in this and in the Bonanza General Operating Policies) with specific regard to standards as outlined above [cleanliness of kitchen, dining area, etc.], he will take immediate action to enforce the correction of such violation, including, if necessary, the prompt institution of legal proceedings against any improperly functioning Bonanza licensee."

Evidence through photographs, testimony of witnesses and quality evaluation checklists, was presented at trial establishing the sub-standard operating and sanitary conditions of B–144 and B–146 and Mr. Kiene and RMC's failure to remedy these violations after receiving notification of same. On January 12, 1982 and January 29, 1982, within six months of having purchased the Bonanza Area Distributorship, Mr. Kiene was provided written notification of the various infractions of the Bonanza General Operating Policies. (See Plaintiff's Exhibits 10A, 10D and 15P).

At approximately the same time and continuing through the time the agreements were terminated, the Louisiana Office of Health Services and Environmental Quality repeatedly notified Mr. Kiene that B–144 and B–146 were in serious violation of state health laws. Agency enforcement proceedings were instituted on several occasions to compel Mr. Kiene's compliance with these laws. Each time Mr. Kiene would agree to remedy the sanitary problems, but, soon after the enforcement proceedings, would allow the sanitary conditions to again deteriorate. (Plaintiff's Exhibit 12 *in globo*).

David Ledford, a former Bonanza employee, testified about the deplorable conditions of B–144 and B–146 immediately prior to Bonanza's sending of the notices of default and immediately prior to the termination of the agreements. He completed Quality Assurance Evaluations on October 27 and October 28, 1982 which made specific references to the sections of the Bonanza Operations and Procedures Manual containing instructions on how to remedy the various problems. (Plaintiff's Exhibits 10B, 10E and 33). The operational deficiencies were discussed with the restaurant manager, who was also given a copy of the Quality Assurance Evaluation. A copy of the Quality Assurance Evaluation was also sent to Mr. Kiene with the default notices for B–144 and B–146. (Plaintiff's Exhibits 7B and 7C).

When Mr. Ledford reinspected the two restaurants thirty days later, he found a further deterioration of the operational and sanitary conditions of the restaurants. (Plaintiff's Exhibits 10C and 10F). He verified some of these violations through photographs which were identified and explained at trial. (Plaintiff's Exhibit 11 *in globo*).

At trial, Mr. Kiene claimed that the various operational and sanitary violations would have required a substantial outlay of capital to correct. However, this assertion was refuted by Mr. Ledford's testimony that routine cleaning with soap and water would have raised both stores' rating within acceptable ranges.

Shortly after his November 29, 1982 inspection, Mr. Ledford received notice from the Louisiana Health Department that administrative enforcement proceedings had been instituted against Mr. Kiene with respect to both B–144 and B–146 based on violations of the state sanitary code. (Plaintiff's Exhibits 12J, 12K, 12P, 12U and 12V). These enforcement proceedings further evidenced the seriousness of the problems and the validity of Mr. Ledford's ratings.

■ Mr. Kiene and RMC clearly violated paragraph 14B of the Area Distributor's

Agreement by failing to take effective action to correct operational and sanitary defaults within thirty days following the sending of written notice by Bonanza to the Area Distributor and also violated Paragraph 14C by failing to adhere to the Bonanza and Area Distributor General Operating Policies. The same actions which constituted breaches of the Area Distributor's Agreement constituted breaches of the franchise license agreements for each of Mr. Kiene's five restaurants. (Plaintiff's Exhibits 2B, 2C, 2E, 2H and 2I [Paragraphs IV, VI B, VI G and VII]). Additionally, each of the license agreements required that Mr. Kiene operate his restaurants "... in strict compliance with all applicable laws, ordinances, regulations and other requirements of any federal, state, county, municipality or other government...." (Plaintiff's Exhibit VI(I)). Mr. Kiene violated this provision, as evidenced by the Health Department Inspection Reports conducted both before and after the sending of the default notices. (Plaintiff's Exhibit 12, *in globo*). All such breaches constituted cause for the termination of the five license agreements inasmuch as the breaches continued for ten days or more following the sending of written notice. (Plaintiff's Exhibits 2B, 2C and 2E [Paragraph XIV(A) and (B)]; Plaintiff's Exhibits 2H and 2I [Paragraphs XIV(A) and (B) and XV(A)]; Plaintiff's Exhibits 7B, 7C, 7D, 7E and 7F).

In summary, Mr. Kiene and RMC breached its obligation to Bonanza by 1) failing to remit royalty payments timely, if at all; and 2) failing to adhere to the standards of sanitation and cleanliness of the Area Distributorship Agreement, The License Agreements and the General Operating Policies for Bonanza Sirloin Pit Area Distributors. Mr. Kiene was given various warnings through letters and quality assurance evaluations and ultimately on November 5, 1982 default notice. By November 29, 1982 Mr. Kiene had not attempted to remit owed royalties, work out an acceptable payment plan or improve the condition of his restaurants which had received "provisional" ratings. Finally on December 9,

1982, following defendants' failure to remit any royalties to Bonanza from the operations of Mr. Kiene's five restaurants for over a four month period and the failure to correct violations of Bonanza's restaurant cleanliness and food quality requirements in Bonanza Sirloin Pit Nos. 144 and 146 within thirty days of the notice of default, Bonanza justifiably and in keeping with the terms of the Area Distributor and Franchise Agreements terminated the Area Distributor's Agreement of RMC, Inc. and the five Franchise License Agreements held by Michael Kiene.

The terms of the Area Distributorship specifically provide that in the event of termination, the Area Distributor is not relieved of any of its obligations. (Plaintiff's Exhibit 1, Paragraph 14).

Under the license agreements for B–144, B–146 and B–150, Michael Kiene, as area distributor/licensee was obligated to pay 2.4 percent of the restaurants' gross weekly receipts to Bonanza as royalties. (Plaintiff's Exhibits 2B, 2C and 2E, Paragraphs VI(G)). Under the license agreements for B–154 and B–156, Mr. Kiene, as licensee, was obligated to pay 4.8 percent of weekly gross sales to RMC, the area distributor. (Plaintiff's Exhibits 2H and 2I, Paragraph VI(G)). RMC, under their area distributor's agreement, was required to remit one-half of the royalties from B–154 and B–156 to Bonanza. (Plaintiff's Exhibit 1).

When Michael Kiene assigned his interest in the area distributor's agreement to RMC, he personally guaranteed that he would carry out the terms of the area distributor's agreement in the event of a default by RMC. (Plaintiff's Exhibit 4). Accordingly, under both the franchise license agreements and the assignment of the Area Distributor's Agreement, Michael Kiene is personally liable to Bonanza for royalty payments by his five restaurants during the term of the Area Distributor and Franchise License Agreements.

RMC is also liable to Bonanza for all unpaid royalties collected from Mr. Kiene's five restaurants. Mr. Kiene admitted at

trial that daily revenues from his five restaurants were deposited into an RMC checking account. Paragraph 2 (Page 3) of the General Operating Policies incorporated by reference into the area distributor's agreement provides that the area distributor is to collect royalties from all Bonanza restaurants "whether licensed, owned or operated by the distributor...." The same provision requires that one-half of these royalties be remitted to Bonanza.

It is undisputed that no royalties were paid to Bonanza from sales by any of Mr. Kiene's restaurants after July 11, 1982. It was further established at trial that these restaurants continued to operate and receive revenues after July 11, 1982 from which royalty payments were due. (See Plaintiff's Exhibits 24 and 32). Accordingly, defendant's must remit to Bonanza all outstanding royalties equalling 2.4 percent of gross sales receipts by B–144, B–146, B–150, B–154 and B–156 during the period of July 11, 1982 through December 15, 1982, the effective date of termination of the agreements.

Bonanza is further entitled to recover royalties collected by Mr. Kiene from other licensees in the southern area distributorship.

■ It is undisputed that, after the termination of the Area Distributor's Agreement for Southern Louisiana, Mr. Kiene received royalty payments from other licensees in the southern Louisiana area based on sales which occurred prior to the effective date of the termination. (Plaintiff's Exhibit 9, *in globo*). These royalties were earned by Bonanza when the Area Distributor's Agreement was in full force and effect and are payable to Bonanza regardless of when they were received by Mr. Kiene.

If Mr. Kiene received royalties from other licensees from sales made *after* the termination of the Area Distributor's Agreement, he clearly would not be entitled to retain these funds. Under the terms of the Agreement, all rights of the area distributor revert to Bonanza upon the termination

of the Area Distributor's Agreement. (Plaintiff's Exhibit 1, Paragraph 14E).

Accordingly, Bonanza is entitled to judgment in its favor and against RMC and Michael Kiene for a sum equalling Bonanza's one-half portion of all sales royalties collected by Mr. Kiene and RMC from other licensees within his Area Distributorship.

As an inducement for Bonanza's consent to the sale by Stewart, Paul Kiene agreed to assume, as guarantor, all rights, duties and obligations under the area distributor's agreement and franchise license agreements at issue in this case. (Plaintiff's Exhibit 3). This guaranty agreement remains in full force and effect. Following Michael Kiene's and RMC's failure to remit royalty payments to Bonanza, demand was made upon Paul Kiene, as guarantor, for the payment of such royalties. No payments were ever made.

Upon being joined as a defendant in the present action, Paul Kiene asserted that his guarantee agreement was void due to alleged mental incapacity at the time of the signing. However, no evidence was adduced at trial of any alleged mental incompetence.

A party raising the defense of mental incapacity has the burden of proving that he was deprived of reason at the time of contracting and that the other party knew or should have known of such incapacity. La.C.C. Art. 1925. *Meadors v. Pacific International Petroleum Company, Inc.,* 449 So.2d 26 (La.App. 1st Cir.1984); *Mashia v. Pollard,* 442 So.2d 1249 (La.App. 5th Cir.1983); *First National Bank of Shreveport v. Williams,* 346 So.2d 257 (La.App. 3rd Cir.1977) (presumption of contractual capacity not easily overcome).

■ In the absence of evidence to the contrary, this Court finds that Paul Kiene was mentally competent to enter into the guarantee agreement in favor of Bonanza.

■ Bonanza has taken no action which would in any way impair Paul Kiene's subrogation rights or which would operate to limit or discharge Paul Kiene's obligations

as guarantor. La.C.C. Art. 3059 *et seq.* Accordingly, Paul Kiene is liable to Bonanza for all royalty payments owed by Michael Kiene under the area distributor's and franchise license agreements.

Additionally, Louisiana Revised Statute 9:2781 provides that when a person fails to pay an "open account" within thirty days after receipt of written demand setting forth the amount owed, with a copy of the supporting invoices, the person shall be liable for reasonable attorney's fees for the prosecution and collection of the claim when judgment is rendered in favor of the claimant.

"Open account" is defined by the statute as any account for which a part or all of the balance is past due, whether or not the account reflects one of more transactions or whether or not at the time of contracting the parties expected future transactions La.R.S. 9:2781(C).

■ In the present case, Michael Kiene admits to the receipt of written demand for royalties from B–144, B–146 and B–150. (Plaintiff's Exhibits 7B, 7C and 7D). Each of these demands included an invoice correctly setting forth royalties which are due and owing and have never been paid to Bonanza. The written notices to the remaining two restaurants and to the area distributor contain similar information but were "refused" when delivery was attempted by the United States Postal Service. (Plaintiff's Exhibits 7A, 7E and 7F). Under La.R.S. 9:2781(B), a court may find that there has been written demand on the debtor for purposes of the recovery of attorney's fees if there is sufficient evidence of due diligence in the delivery of the written demand. Bonanza's introduction into evidence of the refused demands bearing the official notations of attempted delivery by the post office clearly constitutes sufficient evidence of due diligence and delivery. Additionally, Mr. Kiene testified at trial that he later requested and received after the date of termination, copies of the previously refused default letters.

Accordingly, Bonanza has complied with the provisions of La.R.S. 9:2781 and is enti-

tled to judgment in its favor requiring the payment by defendants of reasonable attorney's fees incurred in connection with the prosecution of this action.

In defense to the claims made by Bonanza and in the form of counterclaims, Mr. Kiene asserts several arguments. First he alleges Bonanza unjustifiably terminated the Area Distributor and Franchise Agreements. As earlier stated, defendant's first allegation that the terms of the contract with respect to the termination clause, had been orally modified, was not substantiated at trial. Mr. Kiene's contention that Bonanza agreed it would not default and/or terminate any contract where royalties or other debts were outstanding unless a payment plan could not be worked out, lacks merit. Primarily, because the terms of the contract could not be modified unless reduced to writing and agreed on by all parties and secondly, had such an agreement been reached, Mr. Kiene did not comply with the new requirements, i.e. he failed to conscientiously work out a payment plan with Bonanza or even return Bonanza's efforts to contact him.

Secondly, defendants allege that Bonanza's actions constituted a breach of Good Faith and Fair Dealing. This claim is divided into two parts: a) selective enforcement of the default and termination; and b) intentional failure to provide a reasonable amount of training and assistance.

In every contract there is an implied covenant that neither party will do anything which will prevent the other party from performing his obligations under the contract. This implied obligation is commonly referred to as the implied covenant of "good faith and fair dealing". *See* La.C.C. Art. 1983; Uniform Commercial Code, Section 1–201(19) and 1–203. *Crossland v. Canteen Corporation,* 711 F.2d 714, 728 (5th Cir.1983); *Corenswet, Inc. v. Amana Refrigeration, Inc.,* 594 F.2d 129 (5th Cir. 1979); *Niagara Mohawk Power Corporation v. Graver Tank and Manufacturing Company,* 470 F.Supp. 1308 (N.D.N.Y. 1979). However, any such implied covenant cannot properly be used to override or

strike express contract terms. *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480 (5th Cir.1984); *Corenswet, Inc. v. Amana Refrigeration, Inc., supra. See Murphy v. American Home Products Corporation,* 58 N.Y.2d 293, 448 N.E.2d 86, 461 N.Y.S.2d 232 (1983).

Mr. Kiene avers that Bonanza did not fulfill its contractual obligations to him with regard to training, assistance, guidance, and advice in every step of his normal operations as Area Distributor, as that provision had been interpreted to him by Bonanza officials, as well as under any reasonable interpretation of that provision. Moreover, Mr. Kiene avers that Bonanza did not fulfill its contractual obligations with regard to "promoting and publicizing the Bonanza program on a regional and national level wherever Bonanzas are located", thus preventing defendants from fulfilling their contractual obligations to Bonanza. Defendants submit that Bonanza's non-support prevents its enforcement of the termination provisions under the contract. The Area Distributor's Contract provides:

> IFC (Bonanza) will train and offer assistance, guidance and counsel to Area Distributor in Licensing, location, selection, construction, finance, equipment, advertising, grand opening, publicity, public relations, operations, budgets, supply coordination and every other phase of Distributors operation.
>
> This intensive training will be free of charge to Distributor ..., and IFC (Bonanza) shall pay or provide room and board for one person for one full week in order to accomplish this training. Training shall take the form of "on the job" experience and exposure to all facets of a Distributor's business.
>
> Distributor shall work with IFC's (Bonanza's) experienced sales personnel in order to observe franchise sales techniques, and with executives of the various operating departments.
>
> IFC (Bonanza) agrees:
>
> B. To provide Area Distributor with training, assistance, guidance, and advice in every step of his normal operation as Bonanza Sirloin Pit Area Distributor. E. To aggressively promote and publicize the Bonanza program on a regional and national level wherever Bonanza's are located.

(Plaintiff's Exhibit 1).

Mr. Kiene submits that Bonanza did not fulfill its obligations under the agreement, to train and lend assistance to him, as an Area Distributor. However, testimony adduced at trial did not support this position.

On July 3, 1981, prior to the closing of the sale from the Stewarts to Mr. Kiene, Mr. Kiene declined Bonanza's offer for him to participate in their five week training program. Also in opposition to defendant's assertion that Bonanza failed to train and lend assistance to Mr. Kiene, Bonanza established that its marketing personnel visited with Mr. Kiene in New Orleans and corresponded with him on a regular basis with suggestions for advertising and increasing restaurant sales. Mr. Kiene received extensive promotional and advertising materials from the National Creative Group, a non-profit organization funded through annual fees from licensees and matching funds from Bonanza. Bonanza field marketing representatives offered suggestions on the best ways to utilize advertising and to promote restaurant sales. According to Virginia Waldvogel, who was hired by Mr. Kiene to handle the promotion and advertising of his five Bonanza restaurants, a week would seldom pass without defendants receiving some form of communication from Bonanza on marketing matters. (*See e.g.* Plaintiff's Exhibits 15D, 15H, 15M, 15N, 15Q, 15U, 15V, 15W, 15X, 15AA, 15CC, 15DD and 15EE).

Field operations personnel of Bonanza also provided advice to Mr. Kiene on ways to improve the operations of his restaurants. Glenn L. Williams, Director of Field Operations, visited with Mr. Kiene in New Orleans during 1981 and 1982 to discuss various problem areas which needed to be rectified by Kiene. Mr. Williams followed-up these matters with written recommenda-

tions. (Plaintiff's Exhibits 15G, 15M and 15T).

Field Service Representatives, Ralph Messer and David Ledford, visited Mr. Kiene's restaurants to conduct Quality Assurance Evaluations. These evaluations detailed those operational areas needing improvement and referenced the sections of the Bonanza Operations and Procedures Manual which explained the methods for making such improvements. (Plaintiff's Exhibits 10A–10F).

Both Mr. Messer and Mr. Ledford spent time discussing these evaluations with Mr. Kiene and/or his managers and other Bonanza officials offered suggestions to Mr. Kiene in writing on ways to improve his restaurant operations. (See Plaintiff's Exhibits 15G, 15N, 15T and 15AA).

Ed Kosan, Director of Franchise Operations, maintained continual contact with Mr. Kiene and offered suggestions on ways Mr. Kiene could attract new licensees to his area. In this regard, Bonanza conducted advertising in national publications, such as the Wall Street Journal, and at trade shows in an effort to generate public interest in opening new Bonanza franchises.

In summary, Bonanza made numerous good faith attempts to assist Mr. Kiene in all areas of his operations. Numerous Bonanza officials, including John Bill (Regional Marketing Manager), Glenn Williams (Director of Field Operations), Dianne Young (Director of Training), Ed Kosan (Vice-President of Franchise Development), Gregg Simmons (Director of Credit and Collections), Tom Keyser (Franchise Training Specialist), Bill Eder (Field Operations Representative), Ralph Messer (Field Operations Representative) and David Ledford (Field Operations Representative) traveled to New Orleans and personally visited with Mr. Kiene and/or his staff to offer suggestions and assistance in all facets of his operations as licensee and Area Distributor. The extensive nature of this help is highlighted by the fact that many of these individuals came to New Orleans on more than one occasion during the seventeen month period in which the contracts

were in force. These and other Bonanza officials also communicated in writing and by telephone with Mr. Kiene and his staff on a regular basis. (See *e.g.* Plaintiff's Exhibit 15, *in globo*). Accordingly, defendants' assertion that Bonanza failed to fulfill its obligation under the Area Distributor's Agreements to train and assist Mr. Kiene is unsupported by the evidence.

From a legal standpoint, it appears that defendants are attempting to override the termination provisions of the Area Distributor's Agreement through the use of the implied obligation of good faith and fair dealing. The jurisprudence is clear that implied covenants cannot override express contractual provisions, as in this case where the Area Distributor's Agreements specifically provides for termination upon the occurrence of certain events. *See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 485 (5th Cir.1984); *Corenswet, Inc. v. Amana Refrigeration, Inc.,* 594 F.2d at 138 (5th Cir.1979).

Defendants further allege that Bonanza breached the implied obligation of good faith and fair dealings by "unequal" treatment, i.e. not exercising its right to terminate other Area Distributorship Agreements throughout the United States, for failure to timely pay royalties and maintain their restaurants in accordance with Bonanza General Operating Policy Standards.

As previously stated herein, every contract contains an implied covenant that neither party will do anything which will hinder or prevent the other party from performing that particular contract. By definition, compliance or non-compliance with this covenant can only be determined by reviewing the actions of the particular parties in relation to each other under the particular contract at issue. Whether or not Bonanza treated defendants differently than other area distributors has no bearing on whether Bonanza acted fairly and in good faith in their treatment of defendants under the Area Distributor's Agreement. *See Bergen Rambler, Inc. v. American*

*Motors Sales Corporation,* 30 F.R.D. 334 (D.N.J.1962).

Regardless of the relevancy or irrelevancy of Bonanza's dealings with third parties, any evidence of good faith and fair dealing cannot be used to override express provisions of the written contract.

■ It is well established in Louisiana, New York and other jurisdictions that, where the express intention of contracting parties is clear, a contrary intent will not be created by implication. The implied covenant of good faith and fair dealing cannot give contracting parties rights which are inconsistent with those set out in the contract. *Broad v. Rockwell International Corporation,* 642 F.2d 929, 957 (5th Cir. 1981). *See also Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 485 (5th Cir.1984); *Corenswet, Inc. v. Amana Refrigeration, Inc.,* 594 F.2d 129, 138 (5th Cir.1979). The Area Distributor's Agreement for southern Louisiana specifically and clearly provided for termination of the agreement in the event of non-payment of royalties and certain operational violations, among other things. These termination provisions cannot be "read out of the contract" through any implied agreement, if such an agreement was indeed violated.

■ Furthermore, the instances cited by defendants can easily be distinguished from defendant's situation. For example, with respect to Stewart, Bonanza described its long standing, successful relationship with the Stewarts, which included the timely payment of royalties, and explained that the delinquent royalty payments referred to by Mr. Kiene were those payments which had accrued during the time Stewart was negotiating with Mr. Kiene to sell the Area Distributorship. Stewart had advised Bonanza that all royalties would be paid at the time of the closing of the sale and remained in communication with Bonanza each time the closing date was rescheduled. Stewart, thereafter, paid these royalties at the July 31, 1981 closing of the sale.

With respect to Steaks of U.S.A., Bonanza showed that they were sent notice of default for non-payment of royalties when those royalties became one month overdue and that, within ten days of the notice of default, all delinquent royalties were paid in full.

Accordingly, defendants have not established that Bonanza failed to fulfill its contractual obligations under the Area Distributor's Agreement in good faith.

Mr. Kiene further asserts that Bonanza was unjustly enriched through the termination of the Area Distributor's and Franchise License Agreements. The prerequisites that must be satisfied to succeed in an action for unjust enrichment or *actio de in rem verso* in Louisiana are:

1. there must be an enrichment,
2. there must be an impoverishment,
3. there must be a connection between the enrichment and the impoverishment,
4. there must be an absence of justification or cause for the enrichment and impoverishment, and
5. there must be no other remedy at law available to the plaintiff.

*Creely v. Leisure Living, Inc.,* 437 So.2d 816 (La.1983); *Pan American Import Co., Inc. v. Buck,* 440 So.2d 182 (La.App. 4th Cir.1983); *City Bank & Trust Co. v. White,* 434 So.2d 1299 (La.App. 3 Cir.1983); *Ranna v. Ranna,* 427 So.2d 584 (La.App. 5 Cir.1983).

The prerequisites under New York law are quite similar: the plaintiff must establish that the defendant was enriched, that such enrichment was at the plaintiffs' expense, and that the circumstances were such that, in equity and good conscience, the defendant should make restitution. *Dolmetta v. Uintah Nat. Corp.,* 712 F.2d 15 (2nd Cir.1983); *Chase Manhattan Bank v. Banque Intra S.A.,* 274 F.Supp. 496 (S.D.N.Y.1967).

Defendant's contend that Bonanza received the value of the Area Distributor's Agreement and of Mr. Kiene's five franchise license agreements when it exercised its termination rights. They further contend that Bonanza received an additional

2.4 percent royalty from other licensees in the southern Louisiana area following the termination of the Area Distributor's Agreement.

As admitted by defendants in their post trial brief, "... Bonanza made no specific contractual promise to pay or reimburse Mr. Kiene for the value of the distributorship upon termination...."

When Bonanza terminated the five franchise license agreements and the area distributor's agreement following the various defaults under those agreements by defendants, Bonanza, in fact, *lost* royalty revenues from the operation of Mr. Kiene's five restaurants and *lost* the services of an area distributor for the southern Louisiana territory. There has been no area distributor for southern Louisiana and no new Bonanza franchise licenses sold in southern Louisiana since the termination of Mr. Kiene's agreement. Since no new franchise licensees were established in the New Orleans area following the termination of Mr. Kiene's five franchise licenses, Bonanza in essence *lost* the entire New Orleans market. Additionally, Bonanza has had to perform the functions of area distributor with respect to the remaining licensees in Louisiana.

The Area Distributor's Agreement for Southern Louisiana specifically provides that all functions; rights and duties of the area distributor "... shall cease and revert to [Bonanza]" ... upon the termination of the area distributor's agreement. (Plaintiff's Exhibit 1, Paragraph 14E). Bonanza had just cause to terminate the agreement, and, under the terms of the agreement, Mr. Kiene relinquished any rights which he had in and to such agreement.

An enrichment is unjust only when there is no justification in law or contract. *New Hotel Monteleone v. First National Bank of Commerce, Inc.*, 423 So.2d 1305 (La. App. 4th Cir.1982); *McDonald v. Champagne*, 340 So.2d 1025 (La.App. 1st Cir. 1976). Defendants, through their breach of the area's distributor's agreement gave Bonanza contractual justification to terminate such agreement. Through defendant's actions, and under the terms of the

agreement, all former rights of Mr. Kiene ceased and reverted to Bonanza and, accordingly, defendants cannot now claim that such cessation or reversion, or the resultant right of Bonanza to enter into a new area distributor agreement with another party, is "unjust".

Additionally, any "enrichment" by Bonanza through the receipt of 4.8 percent royalties from other licensees in defendants' former area distributorship instead of the 2.4 percent royalties received prior to the termination of the area's distributor's agreement is also justified by contract. The license agreements with the other licensees provided that in the event the area distributor's agreement "is terminated for any reason during the term of this agreement, until such time as a new area distributor is appointed by Bonanza International, all duties and obligations of the licensee to the area distributor, hereunder, specifically including, but not limited to, all royalty payments and reporting, shall be made directly to Bonanza International." (Plaintiff's Exhibits 2D, 2F, 2G, 2J, 2K, 2L and 2M, Paragraph XV(B)). Following the justified termination of the area distributor's agreement, Bonanza had legal cause under the various license agreements to require a 4.8 percent royalty payment from the licensees in Mr. Kiene's former area distributorship. Furthermore, Bonanza has *earned* this increase by assuming the duties and obligations which were supposed to be performed by the area distributor. Any "enrichment" through increased royalty payments was not "unjust".

Bonanza had a justified cause for terminating the Area Distributorship Agreement and the resultant rights to enter into a new area distributorship with another party and/or require a 4.8 percent royalty payment from the licensees in Mr. Kiene's former area distributorship. Accordingly, if indeed any enrichment was acquired, it was not unjustified and the attempt by defendant to invoke the claim of unjust enrichment must fail. See *Creely, supra* at 822.

Lastly, Mr. Kiene submits that Bonanza breached its obligation under the

Area Distributor Agreement by failing to submit its disputes regarding the defaults in question to arbitration prior to defaulting and/or terminating the Area Distributor Agreement, thus violating the "Area Distributor's" Agreement provision 16. Defendants waived their right to arbitration by asserting counterclaims, conducting extensive pre-trial discovery and proceeding to trial without at any time requesting that this action be stayed pending arbitration.[6] *Weiland v. Pyramid Ventures Group*, 511 F.Supp. 1034 (M.D.La.1981).

The right to arbitrate may be waived either by express words or by necessary implication. The institution of a counterclaim by one party seeking damages for the alleged breach of a contract and the trial of such suit is incompatible with a later demand for arbitration and constitutes a waiver of the party's right to demand arbitration. *I.D.C., Inc. v. McCain-Winkler Partnership*, 396 So.2d 590 (La. App. 3rd Cir.1981).

Additionally, Mr. Kiene admitted that he at no time requested, verbally or in writing, that Bonanza submit any matter under his area distributor's agreement to arbitration. This inaction by Mr. Kiene, together with his extensive use of the litigation machinery, prevents his post-trial assertion of the right to arbitrate. *See E.C. Ernst, Inc. v. Manhattan Construction Company of Texas*, 559 F.2d 268 (5th Cir.1977); *Burton-Dixie Corporation v. Timothy McCarthy Construction Company*, 436 F.2d 405 (5th Cir.1971). Accordingly, defendant's assertion that Bonanza's failure to submit this matter to arbitration, should prevent them from succeeding in the claims at issue, lacks merit.

In conclusion, Michael Kiene and RMC failed to pay royalties and to comply with operational requirements under the agreements at issue in this case. Bonanza properly exercised its right to terminate the agreements and is now entitled to recover royalties due and owing under such agreements.

Bonanza fulfilled its contractual obligations to defendants and did not breach an implied obligation of good faith and fair dealing in the termination of the agreements. Furthermore, Bonanza's exercise of its termination rights under the agreements did not result in an "unjust enrichment."

Lastly, defendant's non-payment of their open account to Bonanza after proper written demand makes them further liable to Bonanza for the payment of reasonable attorney's fees.

Accordingly;

IT IS ORDERED that judgment be entered in favor of Bonanza and against Michael Kiene, Paul Kiene and RMC imposing liability on defendants for the payment of royalties and attorney's fees in an amount to be determined through a quantum hearing.

IT IS FURTHER ORDERED that there be judgment in favor of Bonanza and against Michael Kiene, Paul Kiene and RMC on all of the counterclaims asserted by defendants.

---

**6.** Mr. Kiene raised by means of a counterclaim that Bonanza failed to submit this matter to arbitration, however, he never requested arbitration proceeding nor did he request that this action be stayed pending arbitration.