457 S.E.2d 502

**BARN–CHESTNUT, INC., a West Virginia Corporation, Plaintiff,**

**v.**

**CFM DEVELOPMENT CORPORATION, a West Virginia Corporation, Defendant.**

**No. 22474.**

Supreme Court of Appeals of West Virginia.

Submitted Feb. 28, 1995.

Decided April 14, 1995.

---

Robert A. Yahn, David J. Sims, Yahn & Sims, Wheeling, for plaintiff.

John P. Bailey, Harry L. Buch, Bailey, Riley, Buch & Harman, Wheeling, for defendant.

WORKMAN, Justice:

This case is before the Court upon the March 31, 1994, order of the Circuit Court of Ohio County certifying the following two questions to this Court:

1. If a franchise agreement depends upon the existence of a valid underlying lease agreement to be in effect, is a lessor/franchisor required to offer a successive lease agreement to a lessee/franchise[e] upon the expiration of the original lease, absent any renewal clause in the lease or franchise agreement?

2. Alternatively, is the lessor/franchisor required by an implied obligation of good faith, fair dealing and commercial reasonableness to offer a renewal of the lease agreement to lessee/franchisee upon reasonable terms? [1]

The circuit court answered both questions in the negative. Upon a review of the record, the parties' briefs and all other matters submitted before this Court, we affirm the circuit court's answers.

I.

In February 1978, Daniel A. Steiniger paid $12,000 for a 40% interest in Barn–Chestnut, Inc. (hereinafter "BCI"), the Plaintiff in this action. William Medovic, President of Grocers Development Corp. (hereinafter "GDC"), paid $18,000 for the other 60% interest in BCI. Subsequently, on August 16, 1978, BCI entered into a franchise agreement with GDC for a Convenient Food Mart located at 287 South Chestnut Street, Barnesville, Ohio "for as long as [BCI] . . . shall have a good and valid lease or sub-lease to, or shall own the premises described as: Convenient Food Mart # 3820[,] 287 So. Chestnut Street in the Village ·of Barnesville. . . ." [2] In consideration of the grant of

1. The original certification order was entered on January 27, 1994, and posed two different questions. That order was amended by the March 31, 1994, order and contained the two questions quoted *supra* in the text of this opinion. While the amended order states that "the Court Certified Question Order, entered January 27, 1994, shall otherwise remain in effect[,]" this Court, as previously indicated, will " 'retain some flexibility in determining how and to what extent [a certified question from a circuit court to us] will be answered.' " *Hayes v. Roberts & Schaefer Co.,* 192 W.Va. 368, 372, 452 S.E.2d 459, 463 n. 6 (1994) (quoting *City of Fairmont v. Retail, Wholesale, and Dep't Store Union, AFL–CIO,* 166 W.Va. 1, 3–4, 283 S.E.2d 589, 590 (1980)) (bracketed material not in original). Accordingly, we find it necessary to answer only the two questions presented in the March 31, 1994, order.

2. Both parties are West Virginia corporations, while the leased premises and the franchise at issue are located in Ohio. Also, both the franchise and lease agreements were executed in

the Convenient Food Mart, BCI agreed to pay $4,500 as an initial franchise fee, as well as a continuing franchise fee equal to 4% "of the gross sales done at or from said establishment during the prior week." Also, as part of the franchise agreement, Mr. Steiniger was made the manager of the Convenient Food Mart.[3]

On August 24, 1978, BCI entered into a fifteen-year agreement with GDC to lease a certain parcel of land located at 287 South Chestnut Street, Barnesville, Ohio. The beginning and expiration dates of the term of the lease, which were confirmed by BCI and GDC were "[b]eginning August 24, 1978 and [e]nding August 23, 1993[.]" Under the lease, GDC agreed to pay a basic rental in the amount of $1,200 per month, and 2% of the gross sales in excess of $720,000 annually. Neither the franchise agreement nor the lease agreement contained any provisions regarding the renewal of either agreement.

As a result of Mr. Medovic's desire to retire, he sold GDC's 60% interest in BCI to Mr. Steiniger for $170,325,[4] on July 1, 1988. Mr. Steiniger asserts that Mr. Medovic advised him that if he did not buy out Mr. Medovic's interest, he would lose the franchise and be removed as the franchise manager. At the same time, Mr. Steiniger was also given the opportunity and first right of refusal to purchase the building which housed GDC's Convenient Food Mart store in Barnsville, Ohio for $220,000, but he was unable to do so.

Subsequently, by deed dated July 26, 1988, GDC conveyed the parcel leased to BCI to the Defendant, CFM Development Corporation (hereinafter "CFM") subject to the terms of the GDC/BCI lease.[5] This conveyance was upon the same terms and for the same price for which it was originally offered to Mr. Steiniger. CFM was a separate corporation founded and operated by Charlie Swart, a former employee of GDC, together with several other partners unrelated to GDC.[6]

The Plaintiff never attempted to renegotiate the lease and franchise agreement in light of the ownership changes despite its knowledge that the existing lease and franchise agreements would expire by their terms in August of 1993. According to the Plaintiff, on September 17, 1992, the Defendant advised the Plaintiff that it did not intend to renew the lease which expired on August 23, 1993. Without the lease, the franchise agreement would also terminate.

The Defendant did inform the Plaintiff that it would enter into a new lease for said location with the Plaintiff, but that the rent

---

West Virginia. While the terms of the franchise agreement provide that "[t]his Agreement shall be interpreted and construed in accordance with, and shall be governed by the laws of the State of Ohio[,]" no similar provision exists in the lease agreement. We need not interpret either agreement, since we conclude that both have expired by their express terms. Rather, we determine only whether under any of the theories propounded by the Plaintiff, the Defendant must offer the Plaintiff new agreements. Finally, neither party raises as error the application of West Virginia law in answering the certified questions at issue by either the circuit court or this Court.

3. As manager, Mr. Steiniger received a gross weekly salary of $270 for the first six months. Thereafter, his salary was adjusted quarterly, either upward or downward, depending upon the preceding six weeks' sales, exclusive of gasoline, of the prior quarter. According to a schedule attached to the franchise agreement, his salary would range from $200 to $380 per week. In addition to the weekly salary, Mr. Steiniger received a bonus ranging from 25% to 50% of the "income from grocery operations for the year after the deduction for the manager's salary, provided that the percentage requirement of income from grocery operations before the manager's salary is met."

4. According to the record, Mr. Steiniger purchased 100 shares of stock in BCI from GDC for $94,625 and BCI purchased the remaining 80 shares of stock in BCI from GDC for $75,700, for a total acquisition cost of $170,325.

5. According to the Defendant's brief, GDC sold all its physical assets and real property to CFM in July of 1988. In addition to the purchase of GDC's assets, CFM assumed the position of franchisor under the franchise agreements executed by GDC. The record does not contain the amount of money CFM paid to GDC for the acquisitions. Subsequently, GDC was voluntarily dissolved as a corporation on March 7, 1989.

6. In March 1992, CFM was experiencing difficulties in its operation of the franchise business and Charlie Swart sold all the stock in CFM to Gregg DeSantis together with several other partners. Mr. DeSantis was also a former GDC employee.

would be increased from $1,200 per month, plus 2% of gross sales over $720,000, to $2,850 per month for the first two years of the new lease, eventually escalating to $3,000 per month in the seventh and eighth years of the new lease. The Defendant later offered a lower rent of $2,650 per month for the first four years of the new lease, escalating to $2,850 per month in the eighth year. It is significant to note that the Plaintiff had the property appraised and that the appraiser determined a rental value of $2,166 per month.[7]

In addition to the new lease, the Defendant offered the Plaintiff a new franchise agreement. Under the terms of the new agreement, the franchise fee increased from 4% of gross sales to 4.75% of gross sales. The 4.75% franchise fee is the nonnegotiable franchise fee charged to all of the Defendant's new or renewed franchisees.

## II.

■ The first certified question concerns whether a franchise agreement which is dependent upon the existence of a valid underlying lease requires a lessor/franchisor to offer a successive lease agreement to a lessee/franchisee upon the expiration of the original lease, absent any renewal clause in either the lease or franchise agreement. The Plaintiff, relying on this Court's decision in *Ashland Oil, Inc. v. Donahue*, 159 W.Va. 463, 223 S.E.2d 433 (1976), maintains that non-renewal of the lease and franchise agreement was the direct result of the disparity in bargaining power between the parties and, therefore, is unconscionable and void as against public policy.[8] In contrast, the Defendant maintains that the Plaintiff's assertion that the absence of a non-renewal provision in the lease and franchise agreement is unconscionable and void as against public policy is wholly without merit.

■ It is important to note at the outset that our decision in *Ashland Oil* does not concern either the presence of renewal provisions or the lack thereof; rather, it dealt solely with termination provisions.[9] *See id.* at 470, 223 S.E.2d at 438. Undeniably, in that case, we found as unconscionable on its face, a ten-day cancellation clause contained

---

7. The Plaintiff contends that this figure includes taxes and insurance and that the Defendant's rental figure of $2,650 excludes taxes and insurance. However, there is no evidence in the record which supports the Plaintiff's contention.

8. The Plaintiff also asserts that the Defendant is equitably estopped from refusing to renew BCI's lease and franchise agreement under reasonable terms and conditions. The doctrine of equitable estoppel requires a showing by a plaintiff that the defendant undertook some affirmative action upon which the plaintiff relied to his detriment. *See Humble Oil & Ref. Co. v. Lane*, 152 W.Va. 578, 585–86, 165 S.E.2d 379, 384 (1969) (discussing *Martin v. City of Spokane*, 55 Wash.2d 52, 345 P.2d 1113 (1959)). Further, "[t]he doctrine of estoppel should be applied cautiously and only when equity clearly requires it to be done." Syl. Pt. 3, *Humble Oil and Ref. Co.*, 152 W.Va. at 579, 165 S.E.2d at 381. Since the Plaintiff in this case not only failed to offer any authority supporting the application of the doctrine of equitable estoppel to this case, but also failed to direct this Court's attention to any facts indicating that the Plaintiff detrimentally relied on the affirmative acts of the Defendant, we conclude that the Plaintiff's argument on the issue of equitable estoppel is without merit.

9. Interestingly, even though the present case does not involve the termination of either agreement, the Plaintiff repeatedly directs this Court to cases regarding termination of franchise and lease agreements, and attempts to couch the Defendant's conduct as a termination. *See Highway Equip. Co. v. Caterpillar, Inc.*, 707 F.Supp. 954 (S.D.Ohio 1989), *reh'g denied*, 908 F.2d 60 (6th Cir.1990); *Dayan v. McDonald's Corp.*, 125 Ill.App.3d 972, 989–94, 81 Ill.Dec. 156, 169–72, 466 N.E.2d 958, 971–74 (1984); *Bak–A–Lum Corp. of America v. Alcoa Bldg. Prods., Inc.*, 69 N.J. 123, 129–30, 351 A.2d 349, 351–52 (1976); *Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 375, 390 A.2d 736, 741–44 (1978). However, the circuit court correctly indicated in its memorandum opinion and order dated December 16, 1993:

> this case does not concern the issues of unilateral termination or terminations at will. As well, the original 15–year lease made no reference to a renewal option. Indeed, the agreements between Barn–Chestnut and CFM would be new agreements. In that regard, the Court agrees with the defendant that the plaintiff seeks to have the defendant offer a new lease and franchise agreement upon judicially imposed terms.
>
> Both parties assumed certain business risks when they entered a 15–year lease with no renewal clauses or options contained for either party.

only in the dealer's agreement,[10] and available only to the dealer, holding that "[t]ermination provisions of an agreement involving the sale of goods which, if applied strictly, are so one-sided as to lead to absurd results, will be declared unconscionable." *Id.* at 463, 223 S.E.2d at 435, Syl. Pt. 2. However, the Plaintiff in the present case misguidedly relies upon *Ashland Oil* to support his disparity in bargaining power argument since we specifically rejected that argument in *Ashland Oil,* stating that

> we do not find it necessary to base our holding upon a disparity in bargaining power between Ashland and Donahue. In most commercial transactions it may be assumed that there is some inequality of bargaining power, and this Court cannot undertake to write a special rule of such general application as to remove bargaining advantages or disadvantages in the commercial area, nor do we think it necessary that we undertake to do so.

*Id.* at 474, 223 S.E.2d at 440; *but cf. Shell Oil Co. v. Marinello,* 63 N.J. 402, 307 A.2d 598 (1973), *cert. denied,* 415 U.S. 920, 94 S.Ct. 1421, 39 L.Ed.2d 475 (1974).

Additionally, under common law, "[a]bsent contrary statutory provisions, manufacturers are free to enter into franchise agreements for the distribution of their products as they see fit." Syl. Pt. 2, in part, *McDonald's Corp. v. Markim, Inc.,* 209 Neb. 49, 50, 306 N.W.2d 158, 159 (1981). It is undisputed that West Virginia has only one statute specifically governing the contents of franchise agreements, and it is inapplicable to this case. *See* W.Va.Code §§ 47–11C–1 to –8 (1992) ("West Virginia Petroleum Products Franchise Act"). As the Supreme Court of Oregon noted in *William C. Cornitius, Inc. v. Wheeler,* 276 Or. 747, 556 P.2d 666 (1976), "[w]e do not believe that the failure of a lessor to include a renewal provision in a lease is per se unconscionable *and, without legislative guidance, we have no basis for declaring that public policy requires such a*

*provision* in some leases and not in others." *Id.* at 755, 556 P.2d at 670 (emphasis added).

■ Having concluded that there are no applicable statutory provisions regarding renewal clauses in this case, we follow the *Wheeler* decision in declaring that there is no concomitant public policy which has been violated due to the absence of said clauses from the agreements. *See id.* Moreover, under the standard enunciated in *Ashland Oil,* we cannot declare that the lack of any renewal clause is unconscionable since the absence of said provision is not "so one-sided as to lead to absurd results." 159 W.Va. at 463, 223 S.E.2d at 435, Syl. Pt. 2, in part. Thus, where a franchise agreement is contingent upon the existence of a valid underlying lease to be effective, absent any statutory provisions regarding renewal of either the lease or franchise agreement or any express renewal provisions contained within either the lease or franchise agreement, a lessor/franchisor is not required to offer a successive lease agreement to a lessee/franchisee upon the expiration of the original lease.

In the present case, the Plaintiff having full knowledge that the lease agreement was for a fixed term of fifteen years, that neither agreement contained a provision for renewal, and that the franchise agreement he entered into with the Defendant was contingent upon the lease agreement, still voluntarily chose to enter into this business relationship with the Defendant. Further, even though the Defendant was not required to offer the Plaintiff a successive agreement, the Defendant did so, giving the Plaintiff the opportunity to engage in new negotiations. The Plaintiff, rather than responding to the Defendant's invitation to enter into these negotiations for the new agreements, chose to seek judicially imposed terms. The lower court correctly refused to require the Defendant to offer the Plaintiff a renewal of the lease and franchise agreements.

**10.** That clause provided that the dealer could terminate the dealer agreement with ten days written notice if the plaintiff either defaulted in his agreement to "maintain[] the quality, good name and reputation of the products of ... [Ashland Oil]" or should "indulge in practices, which, in the opinion of ... [Ashland Oil] w[ould] tend to impair the quality, good name or reputation of the products, or the good will which ha[d] been built up by ... [Ashland Oil]." *Ashland Oil,* 159 W.Va. at 466, 223 S.E.2d at 436.

## III.

██ The next certified question concerns whether an implied obligation of good faith, fair dealing and commercial reasonableness requires a lessor/franchisor to offer a renewal of a lease agreement to a lessee/franchisee upon reasonable terms at the expiration of the original lease, where said lease lacked a renewal clause. The Plaintiff argues that the obligation of good faith, fair dealing and commercial reasonableness is implicit in every contract executed in West Virginia and requires the Defendant to renew the Plaintiff's lease and franchise agreement under reasonable terms and conditions. In contrast, the Defendant contends that the Plaintiff's claimed existence of an implied covenant of good faith and fair dealing is not applicable to an agreement which expired by its terms.

The Appellant again relies upon this Court's decision in *Ashland Oil* for the proposition that an implied covenant of good faith, fair dealing and commercial reasonableness requires the Defendant to renew the lease and franchise agreement in the present case. In *Ashland Oil,* the parties entered into a lease agreement and a dealer contract, both of which provided for a term of one year from and after November 1, 1968, and thereafter from year to year, subject to certain termination provisions. *Id.* at 465, 223 S.E.2d at 435. Both agreements related to premises which were to be used for and operated as a gas station. *Id.*

██ We held in syllabus point one of *Ashland Oil* that:

A lease agreement and a dealer contract between the same parties, relating to the operation of a gasoline station at identified premises, providing for the same initial term and automatic extensions from year to year, providing for the sale and delivery of gasoline, and with rental provisions directly relating to the sale and delivery of gasoline, will be construed together and considered as forming an agreement involving a transaction in goods which is governed by the Uniform Commercial Code—Sales.

*Id.* at 463, 223 S.E.2d at 434–35. Consequently, we found that even though the lease agreement and dealer agreement were separate documents, "[a] fair reading of the documents discloses that they are so interrelated on their face that either, standing alone would be meaningless without the other...." *Id.* at 469, 223 S.E.2d at 437.

██ Similarly, in the present case, it is clear that the lease and franchise agreement must be viewed together as forming an integrated business relationship, since both agreements pertain to the operation of a food mart which involves the sale of goods, and the existence of the franchise is expressly contingent upon the Plaintiff having "a good and valid lease or sub-lease to, or shall own the premises described as: Convenient Food Mart # 3820[,] 287 So. Chestnut Street in the Village of Barnesville...." Further, according to the lease provisions, the amount of rent the Plaintiff had to pay to the Defendant was based, in part, on the amount of gross sales. Accordingly, we conclude, as we did in *Ashland Oil,* that the lease and franchise agreements will be considered as together forming an agreement involving a transaction in goods which is governed by the Uniform Commercial Code—Sales. *See id.* at 463, 223 S.E.2d at 434–35, Syl. Pt. 1; *see also* W.Va. Code §§ 46–1–101 to –208 (1993).

Since the lease and franchise agreements are governed by the Uniform Commercial Code, "[t]here is imposed upon both parties to a business transaction an obligation of good faith in its performance or enforcement.... The test of 'good faith' in a commercial setting is '... honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade.'" *Ashland Oil,* 159 W.Va. at 474, 223 S.E.2d at 440 (citing W.Va.Code § 46–1–203 and quoting W.Va.Code § 46–2–103(1)(b)) (citation omitted).

Neither the Plaintiff nor the Defendant dispute that if a contract provision should require a party to negotiate a renewal of that contract, then those negotiations must be made in good faith by both parties. However, as we indicated in *Ashland Oil,* the obligation of good faith extends only to the "performance or enforcement" of the business transaction. *See* 159 W.Va. at 474, 223 S.E.2d at 440. Similarly, other courts have

held that " 'the duty of good faith and commercial reasonableness is used to define the franchisor's power to terminate the franchise *only when it is not explicitly described in the parties' written agreements.*' " *Witmer v. Exxon Corp.* 495 Pa. 540, 550, 434 A.2d 1222, 1227 (1981) (quoting *Amoco Oil Co. v. Burns,* 496 Pa. 336, 342, 437 A.2d 381, 384 (1981) (emphasis not in original); *see* 62B Am. Jur.2d *Private Franchise Contracts* § 510 at 425 (1990) ("[T]he good faith requirement applies only in the context of an attempt on the part of the franchisor to terminate its relationship with the franchisee and is inapplicable to negotiations for renewal.").

Further, "where the express intention of contracting parties is clear, a contrary intent will not be created by implication. The implied covenant of good faith and fair dealing cannot give contracting parties rights which are inconsistent with those set out in the contract." *Bonanza Int'l, Inc. v. Restaurant Management Consultants, Inc.,* 625 F.Supp. 1431, 1448 (E.D.La.1986). The Supreme Court of Oregon recognized in *Wheeler,* "the principle that every contract contains an implied condition of good faith and fair dealing in its performance ... does not require that a lease or contractual relationship which is, by its terms, limited to a specific period be converted into a permanent relationship terminable only at the option of the lessee." 276 Or. at 754, 556 P.2d at 670.

This case does not involve either the performance or enforcement of either agreement, because the agreements have expired. *See Ashland Oil,* 159 W.Va. at 474, 223 S.E.2d at 440. Since the implied covenant of good faith and fair dealing does not give contracting parties rights which are contrary to those set out in the contract, and since the parties did not incorporate express renewal provisions in the original agreements, we hold that where a franchise and lease agreement are construed together and considered as forming an agreement governed by the Uniform Commercial Code, absent any express provisions regarding renewal contained within said agreements, a lessor/franchisor is not required by an implied obligation of good faith, fair dealing and commercial reasonableness to offer a renewal of either agree-

ment to a lessee/franchisee. *See id.* at 463, 223 S.E.2d at 434–35.

Having answered the certified questions posed by the Circuit Court of Ohio County, we dismiss this case from the docket of this Court.

Certified questions answered; case dismissed.

BROTHERTON, J., did not participate.

FOX, Judge, sitting by temporary assignment.