**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-1703

THE UNITED STATES OF AMERICA FOR THE USE AND BENEFIT OF
MODERN MOSAIC, LTD., a foreign business corporation,

        Plaintiff – Appellant,

v.

TURNER CONSTRUCTION COMPANY, a New York corporation;
TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA;
FEDERAL INSURANCE COMPANY; FIDELITY & DEPOSIT COMPANY OF
MARYLAND; ZURICH AMERICAN INSURANCE COMPANY; LIBERTY
MUTUAL INSURANCE COMPANY; THE CONTINENTAL INSURANCE
COMPANY,

        Defendants – Appellees.

Appeal from the United States District Court for the Northern District of West Virginia, at
Clarksburg. Frederick P. Stamp, Jr., Senior District Judge. (1:16-cv-00012-FPS-MJA)

Argued: October 31, 2019                Decided: December 26, 2019

Before WYNN, QUATTLEBAUM, and RUSHING, Circuit Judges.

Affirmed by published opinion. Judge Quattlebaum wrote the opinion, in which Judge
Wynn and Judge Rushing joined.

**ARGUED:** Edward J. Sheats, SHEATS & BAILEY, PLLC, Liverpool, New York, for
Appellant. Michael David Griffith, Jr., THOMAS COMBS & SPANN, PLLC, Charleston,
West Virginia; Douglas Leo Patin, BRADLEY ARANT BOULT CUMMINGS,

Washington, D.C., for Appellees. **ON BRIEF:** Jeffrey D. Van Volkenburg, Allison S. McClure, MCNEER HIGHLAND MCMUNN & VARNER, Clarksburg, West Virginia, for Appellant. Michael S. Koplan, BRADLEY ARANT BOULT CUMMINGS, Washington, D.C., for Appellees.

———————

QUATTLEBAUM, Circuit Judge:

One of our country's bedrock principles is the freedom of individuals and entities to enter into contracts and rely that their terms will be enforced.[1] Consistent with that principle, the Federal Bureau of Investigation (the "FBI") entered into a contract (the "Prime Contract") with Turner Construction Company ("Turner"), a large general contractor, to build a major FBI facility in West Virginia. Turner then retained various subcontractors to handle particular parts of the project. One of those subcontractors was Modern Mosaic Ltd. ("Modern"), a firm specializing in precast concrete. Turner and Modern entered into a subcontract (the "Subcontract") outlining Modern's role in the construction of the FBI facility.

During and after Modern's work on this project, disputes between it and Turner arose. After attempts to resolve the disputes failed, Modern sued Turner in the United States District Court for the Northern District of West Virginia.

Modern asserts four main claims: (1) it incurred increased costs because Turner improperly failed to "field verify" the existing garage; (2) it was improperly required to incur the cost of a full-time engineer or licensed surveyor on site; (3) it incurred increased

---

[1] That principle, of course, predates American law. Ancient Greek philosopher Plato said "[i]f a man fails to fulfill an agreed contract—unless he had contracted to do something forbidden by law or decree, or gave his consent under some iniquitous pressure, or was involuntarily prevented from fulfilling his contract because of some unlooked-for accident—an action for such an unfulfilled agreement should be brought in the tribal courts . . . ." Plato, The Laws, BOOK 11, § 23, CONTRACTS. In fact, even earlier cultures relied on contracts. Genesis 21:23-27 reports that the Hebrew patriarch Abraham and King Abimelech of Gerar entered into a contract to resolve a dispute about the ownership of a well at Beersheba, now a modern city in Israel's Negev region.

costs because of the deficient soil remediation work of another subcontractor; and (4) Turner should be estopped from denying Modern's claims because of its improper conduct regarding a mediation between the FBI and Turner.

Properly applying West Virginia law,[2] the district court rejected all of Modern's claims based on the plain language of the Subcontract. First, it granted Turner summary judgment on the field verification claim. Then, after a bench trial, it ruled in favor of Turner on the remaining claims. We agree with the district court. These two sophisticated businesses entered into a detailed contract spelling out their rights and responsibilities in the construction of the FBI facility. The provisions of that contract directly address the very issues raised in this appeal. They also compel the result reached by the district court. Thus, we affirm.

## I. Field Verification

The bulk of Modern's contractual responsibilities consisted of fabricating and installing precast concrete panels on an existing parking garage at the FBI facility. Modern prepared the panels in accordance with the dimensions called for in the engineering drawings. During its work, however, Modern discovered that the parking garage was not built to the specified dimensions. As a result, the panels did not fit to the garage. To correct

---

[2] The application of the Miller Act—the basis for federal question jurisdiction in this case—is not disputed. Even so, the predominant acts relevant to the Subcontract and its performance occurred in West Virginia. As such, that law governs contract interpretation. *See United States ex rel. Shields, Inc. v. Citizens & S. Nat. Bank of Atlanta, Ga.*, 367 F.2d 473, 477 (4th Cir. 1966).

this problem, Modern performed remedial work on the panels costing an additional $975,072.31.

Modern argues that Turner was contractually required to field verify that the parking garage was built to the dimensions of the engineering drawings. If done properly, Modern claims, this would have identified the discrepancy between the as-built dimensions and the contractual dimensions before Modern prepared the panels. According to Modern, proper verification would also have prevented the remedial costs it incurred. The district court rejected this claim finding the contractual documents required Modern, not Turner, to conduct field verification.

A.

Modern first challenges the district court's grant of summary judgment to Turner based on its conclusion that the contracts unambiguously required Modern to field verify the structure. Modern claims that the contracts are ambiguous regarding the responsibility for field verification and that extrinsic evidence supports its interpretation.

This Court reviews a district court's grant of summary judgment de novo. *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*. (quoting Fed. R. Civ. P. 56(a)). In making this determination, "courts must view the evidence in the light most favorable to the nonmoving party and refrain from weigh[ing] the evidence or mak[ing] credibility determinations." *Id.* (internal quotation marks omitted) (quoting *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017)).

5

In challenging the district court's summary judgment decision regarding field verification, Modern points to the Prime Contract. Section 010100 of the Prime Contract required Turner to verify and accept the work of previous contractors and compare the contract documents and the as-built conditions for discrepancies. Further, section 010400 required Turner to verify all existing structures and dimensions as shown on the documents. Relying on these provisions, Modern argues Turner was responsible for field verification.

However, Modern ignores the way these two provisions relate to the rest of the contracts. As the district court properly noted, the Prime Contract contains a "flow down" clause. That provision provides that Modern agreed to be bound by "each and all of the terms and provisions" of the Prime Contract and to assume all of the duties, obligations and responsibilities that Turner assumed toward the FBI. (J.A. 22). Based on this language, Modern was responsible for Turner's obligations under sections 010100 and 010400 of the Prime Contract.

But beyond the flow down provision in the Prime Contract, the Subcontract expressly placed the responsibility of field verification on Modern. Section AP-1 of the Subcontract specifies that the parking garage was existing construction for which Modern was "required to verify and accept [the] existing conditions" in accordance with the contract documents. (J.A. 85). Further, under section AP-5 of the Subcontract, Turner was not required to guarantee dimensions for Modern. Instead, Modern was "responsible for taking field measurements as may be necessary to establish or verify dimensions prior to production of fabricated items." (J.A. 91). Sections AP-1 and AP-5 make clear that Modern was required to field verify the dimensions of the existing parking garage.

6

But if somehow there is still any question about Modern's responsibility for field verification, Articles XI and XIII of the Subcontract eliminate any doubt. Article XI provides that, "[n]otwithstanding the dimension on the Plans, Specifications and other Contract Documents, it shall be the obligation and responsibility of [Modern] to take such measurements as will insure the proper matching and fitting of the Work covered by this Agreement with contiguous work." (J.A. 24). Additionally, Article XIII required Modern, where performance of its work relied on the proper and accurate performance by another subcontractor, to "carefully examine such other work, determine whether it is in fit, ready and suitable condition for the proper and accurate performance of" Modern's work, and report any defects in such work to Turner. (J.A. 25).

"If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue." *World-Wide Rights Ltd. P'ship v. Combe Inc.*, 955 F.2d 242, 245 (4th Cir. 1992). Applying that well-settled principle here, the contractual provisions are clear. As the district court determined, Modern, not Turner, was responsible for field verification. To accept Modern's position, we would need to rewrite the rights and responsibilities that these two sophisticated businesses agreed to in the Subcontract. That is not our job. *See ACA Fin. Guar. Corp. v. City of Buena Vista, Va.*, 917 F.3d 206, 216 (4th Cir. 2019) (declining to impose new terms to a contract to save a party from the express terms of its agreement); *United States v. Race*, 632 F.2d 1114, 1119 (4th Cir. 1980) ("But courts do not write the contracts of parties retroactively, but merely construe the terms of the contract the parties have previously

7

signed."); *Kanawha Banking & Tr. Co. v. Gilbert*, 46 S.E. 225, 236 (W. Va. 1947) ("It is not the province of the court to alter, pervert or destroy the clear meaning and intent of the parties as plainly expressed in the written contract, or to make a new contract for them, by judicial construction of the instrument."). Likewise, in the face of these clear contractual provisions, the district court correctly refused to consider the extrinsic evidence Modern proffered. Modern, after agreeing to the Subcontract, cannot use extrinsic evidence to avoid its unambiguous terms.

B.

Modern also challenges an alternative basis on which the district court rejected Modern's claim for $975,072.31. Modern contends the district court improperly concluded that Modern breached the Subcontract by beginning the fabrication of the panels before Turner approved its shop drawings. According to Modern, Turner accepted its shop drawings for the panels that were to be attached to the parking garage. Therefore, Modern claims Turner should be responsible for the costs Modern incurred to modify the panels after Turner's approval.

Article XII of the Subcontract required Modern to submit shop drawings to Turner that described the details and construction of its work and certified that Modern had "verified [the drawings] against field conditions prior to fabrication." (J.A. 25, 92). Critically, however, both the Subcontract in Article XII and the Prime Contract in section 013000 required Modern to obtain Turner's approval of its shop drawings before it fabricated the concrete panels. Therefore, Modern did not have the contractual right to begin fabrication of the panels until its shop drawings were approved. The district court

8

found that Modern failed to obtain Turner's approval of the shop drawings before it began work. From our review of the record, we find no genuine dispute of material fact as to this issue.

Article XII of the Subcontract provides additional support for the district court's conclusion. Under that provision, even if Turner approved the shop drawings, such approval would not relieve Modern of the responsibility to ensure the proper matching and fitting of its work to the existing parking garage. It provides, "[a]pproval of such shop drawings by Contractor and/or the Architect shall not relieve the Subcontractor of its obligation to perform the Work in strict accordance with the Plans, Specifications . . . nor of its responsibility for the proper matching and fitting of the Work with contiguous work . . . ." (J.A. 82). Once again, Modern's position is directly at odds with the express terms of the contact. When those terms are considered, it is clear that Modern fabricated the panels at its own risk.

For these reasons, we affirm the district court's decision regarding Modern's field verification claim. The district court properly granted summary judgment in favor of Turner because Modern, not Turner, was contractually responsible for field verification and because Modern breached the Subcontract by failing to obtain advanced approval of its shop drawings before fabricating the panels.

## II. Supervisory Surveillance

Modern's second claim relates to expenses it incurred for supervisory surveillance. This claim arose from the FBI's requirement that Modern provide a full-time engineer or

9

licensed surveyor to monitor the installation of the panels. Modern does not deny that some form of surveillance was required under the Prime Contract. However, it contends part-time surveillance met those requirements. Before the district court, Modern contended that the Prime Contract's monitoring requirement unambiguously allowed for part-time monitoring.

The district court disagreed. After the bench trial, it found that the contracts unambiguously required full-time surveillance. It further found that, under the Prime Contract, any disagreements were to be resolved in favor of the FBI, which insisted full-time surveillance was required.

Since this challenge is to the district court's decision after a bench trial, we review the district court's factual findings for clear error and its legal conclusions de novo. *F.T.C. v. Ross*, 743 F.3d 886, 894 (4th Cir. 2014).

On appeal, Modern's argument has shifted. It now argues, for the first time, that the contract is ambiguous with respect to whether full-time or part-time supervisory surveillance was required. Modern argues extrinsic evidence should have been considered on this point and, had it been, the extrinsic evidence would have supported its interpretation of the contract.

We normally do not consider issues raised for the first time on appeal. *Zoroastrian Ctr. & Darb-E-Mehr of Metro. Wash., D.C. v. Rustam Guiv Found. of N.Y.*, 822 F.3d 739, 753 (4th Cir. 2016). This Court will only exercise its discretion to consider such an issue in a civil case where the newly raised argument establishes a fundamental error or a denial

10

of fundamental justice. *In re Under Seal*, 749 F.3d 276, 285 (4th Cir. 2014). Modern fails to meet this high standard.

But even if we were to consider this new argument, it would nevertheless fail. The district court concluded that two separate contractual provisions required Modern to provide full-time surveillance. First, Part 3.8 of Specification 034500 in the Prime Contract—which was incorporated by reference into the Subcontract—required Modern to "[e]rect units under supervisory surveillance of a Professional Engineer or Licensed Land Surveyor." (J.A. 1948). Second, the Subcontract contained an alternative work provision that allowed Turner to exercise an option requiring Modern to provide a "Licensed Land Surveyor or Professional Engineer to oversee precast installation." (J.A. 1947). Turner exercised this option which contained a corresponding obligation to pay Modern $68,000.00 for that monitoring. The district court found that nothing in the language of those two pertinent provisions indicated any part-time limitation on the monitoring requirement. We agree.

The district court also relied on Article XIV of the Subcontract in determining that the FBI's requirement of full-time surveillance was owed deference. Article XIV states that "[t]he Work hereunder is to be performed and furnished under the direction and to the satisfaction of both the [FBI] and [Turner]. The decision of the [FBI] as to the true construction, meaning and intent of the Plans and Specifications shall be final and binding upon the parties hereto." (J.A. 1378, 1950). In our view, Article XIV gives deference to the FBI's interpretation of the architectural design, not the meaning of the contract. *See* J.A. 25 (noting that "[t]he decision of the [FBI] as to the true construction, meaning and

11

intent of *the Plans and Specifications* shall be final and binding upon the parties" (emphasis added)); J.A. 22 (making clear that the "Plans" and "Specifications" relate to the work of the Architect and are distinct from "the terms and provisions of the General Contract"). Thus, we do not rely on this provision in holding for Turner.

Nevertheless, Part 3.8 of Specification 034500 of the Prime Contract and the alternative work provision of the Subcontract are consistent with Turner's position. While Modern asserts a different reading, the fact that two parties offer conflicting interpretations of a contract does not make it ambiguous. *Fraternal Order of Police, Lodge No. 69 v. City of Fairmont*, 468 S.E.2d 712, 717-18 (W. Va. 1996) (quoting *Int'l Nickel Co., Inc. v. Commonwealth Gas Corp.*, 162 S.E.2d 189, 200 (W. Va. 1968)). In the end, the text of the contracts controls, and, under the text of the Subcontract, Modern's interpretation fails. Accordingly, we affirm the district court's denial of Modern's supervisory surveillance claim.

III. Soil Remediation

Modern's third claim relates to costs and expenses it incurred due to the deficient soil remediation for the project by another subcontractor. In addition to fabricating and attaching panels to the existing parking garage, Modern also agreed to install concrete panels on walls that were part of the landscaping for the site. Unfortunately, a prior contractor failed to properly prepare the soil so it could support the panels. Modern had to wait several months for Turner to remediate the soil before it could complete its work. During this time, Modern alleges it incurred costs related to the storage of the panels.

12

When it returned to complete the installation after the soil remediation, Modern discovered that many of the walls were leaning. Upon learning of this problem, Turner instructed Modern to alter the panels to make them fit the walls. Modern calculated its costs for this remediation, Turner submitted those costs to its insurer and Turner then remitted the insurance proceeds to Modern. Modern, however, argues the proceeds did not fully cover its costs and seeks those additional costs from Turner.

In response, Turner argued the "no damages for delay" clause contained in Article IX of the Subcontract barred Modern's claim. That clause provided that if Modern was delayed in completion of the work by any cause not chargeable to Modern, it would not be entitled to any cost reimbursement, compensation or damages except to the extent Turner recovered from the FBI for the delay.

Below, Modern did not disavow the clause. Instead, it argued that the "no damages for delay" clause did not apply because its damages were based on extra work.

The district court, after considering the evidence, determined that while Modern incurred costs in cutting or shaving the panels to fit the leaning walls, those costs had been paid by Turner. It found the remaining amounts sought by Modern—damages for storage, cleaning, loading and shipping of panels during the time its work was delayed—not recoverable. In reaching this conclusion, the district court relied on the "no damages for delay" clause. Applying the clear error standard to the district court's findings of fact and after de novo review of its contractual interpretations, we see no error in the district court's conclusion.

13

On appeal, Modern also lodges a new argument. For the first time, it argues that the "no damages for delay" clause contravenes the purpose of the Miller Act and is, therefore, unenforceable. Modern waived this claim by failing to raise it below.

## IV. Estoppel

Finally, Modern argues that Turner should be estopped from denying Modern's claims because Turner violated Article XXXIII of the Subcontract and breached the duty of good faith and fair dealing when it settled with the FBI. This claim relates to a mediation between the FBI and Turner following the completion of Turner's work. According to Modern, Turner submitted Modern's claims and those of other subcontractors in the mediation. The mediation resulted in a global settlement with the FBI for $23,800,000.00. However, Modern received none of those proceeds. Modern contends that Turner was required to itemize the claims it settled with the FBI and, because it did not do so, it should be estopped from denying Modern's claims.

Initially, Modern appears to have waived this argument for all but one of its claims. Modern did not argue below that estoppel applied to its field verification claim. As such, the district court had no occasion to review this argument and we consider it waived. Second, Modern does not argue estoppel on appeal with respect to the surveillance claim. Thus, the only claim before us regarding estoppel relates to soil remediation. But the district court found Turner never submitted the soil remediation claim to the FBI, and Modern does not challenge this finding of fact. Since the soil remediation claim was not submitted to the FBI, it cannot form the basis of estoppel.

14

But, aside from any waiver issues, Modern's estoppel claim fails substantively. Under West Virginia law,

> [t]he general rule governing the doctrine of equitable estoppel is that in order to constitute equitable estoppel or estoppel in pais there must exist a false representation or a concealment of material facts; it must have been made with knowledge, actual or constructive of the facts; the party to whom it was made must have been without knowledge or the means of knowledge of the real facts; it must have been made with the intention that it should be acted on; and the party to whom it was made must have relied on or acted on it to his prejudice.

*Stuart v. Lake Washington Realty Corp.*, 92 S.E.2d 891, 904 (W. Va. 1956). From our review of the record, we agree that Modern has not satisfied these essential elements. Instead, Modern claims Turner cannot avoid the provisions of Article XXXIII when it seeks to enforce other provisions of the subcontract. Even if Modern's theory of equitable estoppel is consistent with West Virginia estoppel law, Modern's argument fails because Turner does not seek to avoid the provisions of Article XXXIII. To the contrary, Turner contends neither Article XXXIII nor any other provision in the Subcontract supports Modern's position. We agree. The Subcontract imposes no obligation on Turner to itemize the subcontractor's claims in settling with the FBI. Article XXXIII, which addresses dispute resolution, in effect provides the opposite. It makes clear that Modern agrees to be bound by any decisions of the FBI's contracting officer regarding quality of work, differing site conditions, suspensions, changes or the appropriate compensation for these matters. It further provides that Modern's right to receive compensation under the Subcontract is coextensive with Turner's right to receive reimbursement under the Prime Contract. This

15

provision nowhere imposes—or even implies—a requirement that Turner itemize the subcontractor claims in settling with the FBI.

These clear contractual provisions are important in considering Modern's estoppel claim. In keeping with longstanding common law traditions, estoppel principles do not allow Modern to avoid the clear terms of their contract. *See Denzler v. Questech, Inc.*, 80 F.3d 97, 103 (4th Cir. 1996) (declining to address estoppel principles when the relevant contract language was unambiguous); *Barn-Chestnut, Inc. v. CFM Dev. Corp.*, 457 S.E.2d 502, 509 (W. Va. 1995) (*quoting Bonanza Int'l, Inc. v. Rest. Mgmt. Consultants, Inc.*, 625 F. Supp. 1431, 1448 (E.D. La. 1986)) ("The implied covenant of good faith and fair dealing cannot give contracting parties rights which are inconsistent with those set out in the contract."); *Williamson v. Jones*, 27 S.E. 411, 417 (W. Va. 1897) ("So I conclude that estoppel in pais will not defeat the plain, legal right of the plaintiffs.").

V.

Notwithstanding the numerous waiver issues in this case, the district court properly found that the plain and unambiguous language of the contracts resolves this appeal. Modern's claims are entirely inconsistent with the terms of the Prime Contract and the Subcontract. When parties, particularly sophisticated commercial entities like Turner and Modern, negotiate and enter into written agreements, they have a right to expect the provisions of those agreements will not be cast aside when a dispute arises. Accordingly, the district court's rulings are

*AFFIRMED.*

16